## STATE OF CONNECTICUT *v.* MARCUS HARRIS
## (AC 14517)

Dupont, C. J., and Landau and Healey, Js.

---

[14] The trial court did not return the jury for reconsideration pursuant to Practice Book § 311.

Argued March 4—officially released August 19, 1997

*Mark Rademacher,* assistant public defender, for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Cecilia Wiederhold,* assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Marcus Harris, was arrested on June 4, 1992, on a warrant for the May 29 1992, murder of Keith Spruill in New Haven. After waiving a hearing in probable cause, the defendant was tried by a jury of twelve on the charges of murder in violation of General Statutes § 53a-54a and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).

After the state's case-in-chief, the trial court granted the defendant's motion for judgment of acquittal on the pistol charge. The jury found him guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55. The trial court subsequently sentenced the defendant to a term of imprisonment of twenty years.[1]

---

[1] On October 31, 1994, the trial court instructed the jury on the crime of murder in violation of § 53a-54a as charged in the information. It also instructed the jury on the lesser included offenses of manslaughter in the first degree, manslaughter in the second degree and criminally negligent homicide.

General Statutes § 53a-55 provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

In his requests to charge, the defendant's counsel filed requests to charge directed to General Statutes § 53a-55 (a) (1) and (3). He did not file a request directed to § 53a-55 (a) (2). After the final arguments and just prior to the trial court's instruction to the jury, the trial court said that it would "give" the lesser included offenses "although not in the exact language." The court then asked the defendant's counsel: "Are you withdrawing . . . the manslaughter first?" Counsel asked: "With regard to the serious physical injury?" The court replied: "Yes," whereupon defense counsel said: "I think as our discussion, Your Honor, I think the appropriate one here is the language with the one of reckless." The court then said: "Okay. Then that's withdrawn as to the intentional manslaughter in the first degree." The trial court, during its instructions on the law governing § 53a-55, charged on manslaughter in the first degree. In doing so, it did not, however, say it was instructing them as to § 53a-55 (a) (3) but did say that the law given them was applicable to manslaughter in the first degree.

When the jury rendered their verdict, which was accepted, the following occurred:

"The Clerk: Ladies and gentlemen of the jury, have you reached a verdict?

"Jury: Yes, we have.

"The Court: Will the accused, Marcus Harris, please face the jury.

"The Clerk: Please face the accused. In file number CR6-356684, State versus Marcus Harris, what say you, Miss Foreperson, is he guilty or not guilty of the crime of murder in violation of § [53a-54a] of the Connecticut General Statutes?

On this appeal from his conviction, the defendant claims that the trial court improperly (1) denied his

"Foreperson: Not guilty.

"The Clerk: In file number CR6-356684, State versus Marcus Harris, what say you, Miss Foreperson, is he guilty or not guilty of the lesser included offense of manslaughter in the first degree in violation of *§ 53a-55 (a) (2)* of the Connecticut General Statutes?

"Foreperson: We the jury find the defendant guilty of manslaughter in the first degree.

"The Court: I'll order that verdict accepted and recorded.

"The Clerk: Ladies and gentlemen of the jury, listen to your verdict as it is accepted and ordered recorded by the court. You ladies and gentlemen of the jury and each of you do say unanimously that the accused is not guilty of the crime of murder in violation of [§ 53a-54a] of the Connecticut General Statutes, this is your verdict and so say you all?

"Jury: Yes.

"The Clerk: You ladies and gentlemen of the jury and each of you do say unanimously that the accused is guilty of the lesser included offense of manslaughter in the first degree in violation of § 53a-55 (a) (2) of the Connecticut General Statutes, this is your verdict and so say you all?

"Jury: Yes.

"The Court: Ladies and gentlemen, would you just be seated for one moment, please.

"The Court: The verdict may be accepted and ordered recorded. . . ." (Emphasis added.)

There was no further comment concerning the verdict by the court, the state or defense counsel. In examining the foregoing colloquy, the reference by the clerk to § 53a-55 (a) (2) was inadvertent as subdivision (2) was not relevant. It is quite clear that the only subdivision of § 53a-55 (a) that was relevant was subdivision (3). Once the jury found the defendant not guilty of murder as charged under § 53a-54a, the evidence before the jury fit clearly within § 53a-55 (a) (3), and the trial court charged on that subsection.

The mention of the incorrect subdivision by the clerk does not at all affect the validity of the defendant's conviction for the violation of manslaughter in the first degree. The jury response that the defendant had been found guilty of manslaughter in the first degree accurately reflected their verdict under the applicable law, the evidence and the issues.

The apparent purpose of the practice in this state for the establishment of a jury verdict "is to ensure that the court, counsel and the jurors have a common understanding of the verdict, that it is the verdict to which each juror has assented, and that ample opportunity is afforded to cure any misunderstanding. . . . [Although there is no verdict until the court accepts it,] it does not follow that a verdict is deficient if the process leading to acceptance does not precisely conform to the usual accepted practice." (Citations omitted.) *State* v. *Avcollie*, 174 Conn. 100, 104–105, 384 A.2d 315 (1977), drawing on *State* v. *DiPietro*, 120 Conn. 537, 181 A. 716 (1935).

motion to suppress his statement to the police obtained before and after *Miranda* warnings; *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); because he was subject to custodial interrogation and did not waive his rights, (2) failed to suppress his post-*Miranda* statement to the police as the "poisoned fruit of his unwarned statement" under the Connecticut constitution, and (3) instructed the jury on the justified use of deadly force by failing to instruct on the justified use of such force in the defense of another and by "instructing" that the requirement of retreat applied to the use of deadly force in the defense of another.

I

Initially, we set out certain relevant circumstances, under the state's version of the evidence, unless otherwise noted, to serve as a background to put into context the issues raised by the defendant.

During the early morning of May 29, 1992, Oliver Gamble, Kenneth Vincent and the victim were returning in a Ford Mustang from a bar in New Haven. As they proceeded down Read Street, in the Newhallville section, they saw Robert Marshall who was also known as Robert Sutton and whose nickname was Drip. They stopped their car and talked with Marshall. While they were stopped, Kevin Dean and his cousin, the defendant, passed in another car and proceeded in the direction of Newhall Street.[2] Marshall got into the Mustang with Gamble, Vincent and the victim. At that time, Vincent was driving, the victim was on the front passenger side, Gamble was in the back seat behind Vincent and Marshall was in the back seat behind the victim.

As the Mustang took a right turn onto Newhall Street, Dean, who was now on foot at the corner of Newhall

---

[2] Newhall Street runs in a generally north and south direction. Read Street, which runs in a generally east and west direction, intersects and crosses Newhall Street.

and Read Streets, directed himself to the Mustang and indicated that he wanted to speak to the victim. The Mustang pulled up on Newhall Street close to the intersection and the victim got out. Gamble also got out and stood in front of a package store on a corner diagonally across from the corner Dean was closest to. No one in the Mustang had seen the defendant since he and Dean passed the Mustang just shortly before. The defendant, however, was then seen standing on a corner generally behind Dean. Vincent and Marshall remained in the Mustang. No one who arrived in the Mustang—the victim, Gamble, Vincent or Marshall—had a gun.

According to the defendant's version of the evidence, the defendant was on a corner "exactly" across the street from where the Mustang was parked on Newhall Street. The defendant, in his statement to police, indicated that Vincent got out and put his hand on top of the car while Marshall remained in the Mustang.

According to the state's evidence, the victim started walking toward Dean, several times asking Dean "What's up?" Dean started backing away from the victim, telling him not to come too close, and to stay away. According to Gamble, Dean, while backing away, also put his hand behind his back like "maybe he's going to get a gun." There was no physical contact between the victim and Dean. The victim then said something like "F you, if you don't want to talk to me F you all. If you're going to shoot me, just shoot me in the back." The victim turned around, away from Dean, and began walking back toward the Mustang. At that time, the defendant stepped off the curb and reached his arm out and fired a shot at the victim, who fell, first against the Mustang and then to the street. As he was, as Gamble testified, "laying there . . . mumbling," the defendant, after stopping very briefly, ran up to the victim and fired some more shots into him. Dean took off running after the first shot. Marshall got out of the Mustang

after the first shot and ran across the street to a drive-way. Vincent left the scene running into a yard. The defendant ran down Read Street. Gamble and Vincent went over to the victim and told him to hang on as help was coming.

Police Officer Karen Hale, who was in a patrol car in the area, received a radio call at about 12:55 a.m. and went to the scene. When she arrived, she found the victim on the street being supported by Vincent, who was "extremely upset." Although a paramedic tried advanced life support, the victim did not display any vital signs. An ambulance was summoned. Emergency personnel also arrived and, when they were cutting away the victim's clothing, a bullet slug fell on the ground. The victim was then taken to Yale New Haven Hospital.

Later, an autopsy was performed on the victim's body. There were four bullet wounds. One bullet, which entered the back of the right arm, caused fractures of the bones of both the upper and lower arm around the elbow and stayed in the body. Another bullet entered the back of the right upper arm about six inches above the elbow and, after coursing through the pectoral mus-cle, exited on the right side of the victim's chest. Another bullet entered the fleshy part of the right side of the victim's abdomen, traveled "for a distance of three inches under the skin and through the muscle and fatty tissue and came out of the right of the abdo-men and did not pass into the belly cavity, not causing any injury to the organs inside." Wayne Carver, the state medical examiner, opined that, although there were four bullets, only one caused the victim's death. The fatal gunshot wound was one that "goes in the left back . . . [and] passed from the back of his body towards the front of his body somewhat upwards and to the point that when it came out of the front of his chest, it was three inches further away from the ground, if he

were standing up when it went in and that this wound caused damage to the liver, the stomach, the diaphragm and the heart and then came out of his body."

On May 31, 1992, the defendant was interviewed by the New Haven police. He gave them a statement on a tape recorder but would not sign a typed statement of that recording. In the statement, the defendant said that he was present at the scene of the victim's homicide on May 29, 1992, and at that time he had a .44 caliber revolver from which he fired three shots. The tape recording and a transcript of it were admitted at the trial and the tape recording was played for the jury.

The bullets recovered from the victim's body during the autopsy, from his clothing at the scene, and from the Mustang were all .44 caliber. At the trial, there was expert testimony that the .44 caliber bullets were capable of being fired from the barrel portion of the revolver. Because, however, the police never came into possession of the chamber of the gun that the defendant had at the scene of the homicide, the expert could not say definitely that the .44 caliber weapon bullets were fired from the weapon that the defendant had at the time of the shooting. The police also recovered one .38 caliber bullet and two .38 shell casings at the scene.

## II

We now turn to the defendant's claims that the trial court improperly denied his motion to suppress his statement[3] obtained before and after *Miranda* warnings

[3] The defendant had filed a motion to suppress statements and a motion to suppress tangible evidence. A hearing was held on the former on October 24, 1994, just before the taking of evidence at the trial. The trial court decided the latter motion after its denial of the motion to suppress statements. The tangible evidence moved to be suppressed involved that piece of Harris' weapon that came into the possession of his mother after the shooting and after he had thrown the other part away. Because the police obtained the retained portion voluntarily from Harris' mother, the trial court denied its suppression, saying that the defendant would have no standing to object. Defense counsel agreed, saying, "That's the way I see it."

were given to him because he was in custody when interrogated and because he did not make a knowing, intelligent and voluntary waiver of his *Miranda* rights. Not only does the state disagree with these claims but argues that the *Miranda* claims are not entitled to review,[4] and, even if accorded review, the suppression was proper under all the circumstances.

Our prior recitation of the factual circumstances of the homicide puts into focus our discussion and analysis of this issue. The defendant's statement, which the state strongly argues is exculpatory[5] considering its self-

[4] In so arguing, the state says that it is "unclear whether the defendant has met his burden of providing a record sufficient for appellate review." See Practice Book § 4061. As the state points out, the trial court, in its oral decision on the motion to suppress, did decide the ultimate issues of lack of custody and the valid waiver of *Miranda* rights and set out certain specific facts supporting those conclusions. The state notes, however, that the trial court "did not set out all the historical facts covered by Detective [Leroy] Dease."

Detective Dease of the New Haven police department, who took the defendant's statement of May 31, 1992, was the only witness who testified at the suppression hearing. In stating its decision on the suppression motion, the trial court, after finding critical facts regarding the issue of custody, said that "I'll find that based on Detective Dease's testimony there just wasn't any custodial interrogation, it doesn't meet the definition of a custodial interrogation." It said this after stating "I am prepared to rule on now having listened to the evidence, and based on the exhibits as well as the testimony of Detective Dease, I will find, first of all, that there was no custodial interrogation."

On the waiver issue, the trial court stated that its decision was "based on the testimony of Detective Dease that Mr. Harris voluntarily, knowingly and intelligently waived any *Miranda* rights and voluntarily gave these statements. And again, I'm taking into account all of the circumstances. . . ."

This clearly is not a case where the motion to suppress was decided without opinion. See, e.g., *State* v. *Northrop*, 213 Conn. 405, 415 n.6, 568 A.2d 439 (1990). The trial court's articulation of the basis of its decision is sufficient for review. In any event, we are mindful of our obligation to examine scrupulously the record concerning such matters. See id., 414; *State* v. *Harris*, 188 Conn. 574, 579–80, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); see also *State* v. *MacNeil*, 28 Conn. App. 508, 515, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992).

[5] "[W]hether the statement is 'inculpatory' or 'exculpatory' is irrelevant as the *Miranda* decision bars the use of any statements when there has

defense tenor, articulates a version[6] of the facts quite different from the state's version. The defendant refused to sign the *Miranda* warnings and the transcription of his oral statement.[7]

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. *Miranda* v. *Arizona*, [supra, 384 U.S. 444]." (Internal quotation marks omitted.) *State* v. *Williams*, 227 Conn. 101, 112, 629 A.2d 402 (1993); accord *State* v. *DesLaurier*, 230 Conn. 572, 576, 646 A.2d 108 (1994). " 'As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. [*Oregon* v.

---

been a custodial interrogation. *Miranda* v. *Arizona*, supra, [384 U.S.] 476–77; *State* v. *Brown*, [199 Conn. 47, 52 n.4, 505 A.2d 1225 (1986)]." *State* v. *Hoeplinger*, 206 Conn. 278, 289, 537 A.2d 1010 (1988).

[6] The defendant, as was his right, did not testify at the trial. Vincent, Gamble and Marshall all testified for the state.

[7] In *State* v. *Negron*, 221 Conn. 315, 320 n.6, 603 A.2d 1138 (1992), our Supreme Court stated: "We have noted that it is a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing. *State* v. *Frazier*, [185 Conn. 211, 225, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)], quoting *United States* v. *Cooper*, 499 F.2d 1060, 1062 (D.C. Cir. 1974). . . . *State* v. *Whitaker*, 215 Conn. 739, 756, 578 A.2d 1031 (1990)." (Internal quotation marks omitted.) We are aware that waiver is not conclusively established "by demonstrating that *Miranda* warnings were given and understood. . . . Nor is it conclusively rebutted by refusal to sign a form waiving *Miranda* rights . . . nor by refusal to sign a written statement in the absence of legal counsel." (Citations omitted.) *State* v. *Harris*, 188 Conn. 574, 579–80, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

*Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]." See also *New York* v. *Quarles*, 467 U.S. 649, 655, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984); *Minnesota* v. *Murphy*, 465 U.S. 420, 430–31, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984); *United States* v. *Cadmus*, 614 F. Sup. 367, 370 (S.D.N.Y. 1985).' *State* v. *Pittman*, 209 Conn. 596, 608, 553 A.2d 155 (1989); accord *State* v. *Ross*, 230 Conn. 183, 204, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *Thompson* v. *Keohane*, 516 U.S. 99, 114–15, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). 'Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest.'. . . State* v. *DesLaurier*, supra, 577." (Emphasis in original.) *State* v. *Atkinson*, 235 Conn. 748, 757–58, 670 A.2d 276 (1996); see *State* v. *Hoeplinger*, 206 Conn. 278, 286–87, 537 A.2d 1010 (1988).

In *DesLaurier*, our Supreme Court stated: "The defendant had the initial burden of proving custodial interrogation. *United States* v. *Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *State* v. *Doehrer*, [200 Conn. 642, 647, 513 A.2d 58 (1986)]; *State* v. *Vitale*, [197 Conn. 396, 409, 497 A.2d 956 (1985)]. The trial court's determination that the defendant was not in custody is a finding of fact. *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). That finding of fact by the trial court will not be overturned unless it is clearly erroneous. Id.; see Practice Book § 4061; *State* v. *Young*, 191 Conn. 636, 652, 469 A.2d 1189 (1983). We will, however, carefully review the record to ascertain whether the trial court's finding is supported by substantial evidence. *State* v.

*Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); *State* v. *Alexander,* 197 Conn. 180, 185, 496 A.2d 486 (1985). *State* v. *Pittman,* [supra, 209 Conn. 606]. *State* v. *Williams,* supra, 227 Conn. 113." (Internal quotation marks omitted.) *State* v. *DesLaurier,* supra, 230 Conn. 578.

In *Miranda* v. *Arizona,* supra, 384 U.S. 444, the United States Supreme Court defined "custodial interrogation" when it stated "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." "The term interrogation under *Miranda* is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. . . . Moreover, [i]nterrogation as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. *Rhode Island* v. *Innis,* [446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)]. *State* v. *Doehrer,* [supra, 200 Conn. 647]; *State* v. *Palmer,* [206 Conn. 40, 62, 536 A.2d 936 (1988)]." (Internal quotation marks omitted.) *State* v. *Rosado,* 218 Conn. 239, 253, 588 A.2d 1066 (1991).

We apply these principles to the following relevant factual circumstances. It was the defendant, as the trial court found, who initiated the contact with the police on May 31, 1992, and requested a meeting. The police then went to a house owned by the defendant's aunt and met with the defendant, who was there with his girlfriend. His aunt was also present. He voluntarily agreed to go to police headquarters with them to talk with them about the shooting. The defendant, who became seventeen years of age on June 2, 1992, was a suspect before he went to the police station. When they arrived at the police station, Detectives John Greene

and Leroy Dease and the defendant began to talk "just generally" about what had happened. This covered a period of "several minutes," as the court found, and was not tape recorded. "Police officers . . . are not required to administer *Miranda* warnings every time they ask questions at police headquarters even if the person interrogated is a suspect in a crime." *State* v. *Pittman*, supra, 209 Conn. 607; see also *State* v. *Januszewski*, 182 Conn. 142, 159, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). Moreover, "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990); *State* v. *Rasmussen*, 225 Conn. 55, 77, 621 A.2d 728 (1993); see *California* v. *Beheler*, supra, 463 U.S. 1125.

Dease read the defendant the *Miranda* warnings as soon as the defendant indicated that he was at the homicide scene. Dease testified that the defendant told him that he understood "them as his rights, however, he would still be willing to talk with me and tell me the truth." The defendant, however, would not sign the *Miranda* warning form as he did not want to put anything in writing. Dease then asked him if he was willing to give him a taped question and answer statement and he said yes. Dease then took the tape-recorded statement[8] that was ultimately admitted at the trial. While giving his statement to Dease, the defendant was coherent and did not appear to be on any medication or narcotic drugs or intoxicated. In addition, the police did not threaten or coerce the defendant, and the police did not make any promises to him while he was in the police station. The defendant never expressed any desire to leave the police station or to discontinue the interview. Dease had earlier told the defendant that he

---

[8] Dease said that the defendant was not in custody or under arrest on May 31, 1992, the date he gave his statement.

was free to leave any time and he believed that the defendant understood this.[9]

Accordingly, the trial court, in discharging its duty of evaluating the evidence including credibility; see *State* v. *McCarthy*, 197 Conn. 247, 258, 496 A.2d 513 (1985); had to determine the matter of whether the defendant, having been so informed, believed that he was free to leave at any time. "Because the defendant did not testify at the suppression hearing, we do not know if he personally did not feel 'free to leave.' We must look at the totality of the circumstances of the questioning[10] in order to determine whether 'a reasonable person' would have construed those circumstances as placing him in a custody situation." *State* v. *Hoeplinger*, supra, 206 Conn. 287; see also *State* v. *Young*, supra, 191 Conn. 651. "While the defendant had no obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking." *State* v. *Harris*, 188 Conn. 574, 581, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983), and cases cited therein. The trial court could well have resolved that aspect as it did. In fact, after making his statement, the defendant was taken home by his mother.

As the United States Supreme Court has stated: "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon* v. *Mathiason*, supra, 429 U.S. 495. "Since there was no 'interrogation' there was no need for *Miranda* warnings and

---

[9] The defendant did not testify at the suppression hearing or at the trial.

[10] It merits note that the defendant's brief, without transcript citation, states that "once in the interrogation room [the police] questioned him about the homicide without *Miranda* warnings. In doing so they clearly [conveyed] to him that they believed he did it." The defendant points to no evidence of this nor can we find any.

the defendant's statement was properly admitted into evidence." *State* v. *Copeland*, 205 Conn. 201, 207–208, 530 A.2d 603 (1987).

On the basis of the law and the evidence, we conclude that the trial court's finding that the defendant was not the subject of custodial interrogation was based on substantial evidence and was not clearly erroneous. In other words, the defendant was not subjected to "custodial interrogation" as that term is comprehended under *Miranda* v. *Arizona*, supra, 384 U.S. 444; see *State* v. *Rosado*, supra, 218 Conn. 253.

Because we conclude that the trial court's finding that there was no custodial interrogation was not clearly erroneous, we need not address the defendant's claim that he did not validly waive his *Miranda* rights and make a voluntary statement on May 31, 1992.

III

Next, the defendant claims that the trial court improperly instructed the jury on the justified use of deadly force (1) by failing to instruct on the justified use of deadly force in defense of another[11] and (2) by

[11] General Statutes § 53a-19 provides: "Use of physical force in defense of person. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

instructing that the requirement of retreat applied to the use of deadly force in defense of another. In making these claims, the defendant makes several arguments. First, he argues that the evidence at trial viewed most favorably to the defense presented the jury with a choice of two theories of the justified use of deadly force, either one of which could have led to his acquittal by the jury. Here, he contends that, on one hand, his statement to the police raised the claims of self-defense and, on the other, the accounts of the state's witnesses raised the claim that the defendant used force in defense of another. The defendant maintains that the trial court, while instructing on the theory of self-defense, erroneously failed to instruct the jury on the theory of the use of force in the defense of another person, thus depriving him of the right to have the jury pass upon the theory of defense of another. In this regard, the defendant also argues that the trial court, while instructing the jury on the duty to retreat in the context of his own self-defense claim, improperly failed to instruct the jury that the duty to retreat did not apply to his claim that he was properly using force in defense of another person (Kevin Dean), or, at least, by failing to tell the jury that the duty to retreat applied to Dean and not to the defendant. Second, he argues that these claims were preserved at trial by the filing of an appropriate request to charge and by exception when the court failed to charge as requested. Third, in the event, however, that we determine that he failed to preserve these claims,

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

he then requests review under the *Evans/Golding* doctrine.[12] Fourth, he seeks plain error review.

Initially, we address the defendant's claim that he properly requested, and the evidence required, instructions on a second justification defense theory—that of defense of another. As noted, one theory was of self-defense based on his statement to the police that indicated a scenario in which the victim was hit when the defendant fired his gun in response to Marshall's shooting at the defendant. The other theory was the scenario the defendant contends was presented by the state's witnesses in which the victim threatened Dean, who, in turn, appeared to then reach for a gun to threaten the victim at which point the defendant fired at the victim in defense of Dean.

We have already set out much of the relevant evidence produced by the state at the trial. To put the present issue in focus, however, it is necessary to chronicle relevant parts of the defendant's May 31, 1992 statement[13] to the police. The state's theory was that, after the victim turned and walked away from Dean, the defendant then shot the victim. Then the defendant went up to the victim as he was on the ground and fired several more shots into him at close range from behind. The state maintains that its evidence did not support the defense theory concerning the defense of another.

_____

[12] *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973); *State* v. *Golding*, 213 Conn. 233, 239-40, 567 A.2d 623 (1989).

[13] The defendant's statement was admitted in the state's case-in-chief. The only evidence produced by the defense was the testimony of witness Tina Melton, who lived on Read Street about twenty to twenty-five feet from its intersection with Newhall Street. According to her testimony, she knew the defendant, the victim, Gamble, Vincent and Marshall and saw them on the night of the homicide near the intersection. She said, "Words was passed" between the defendant and the victim but "she didn't hear what was going on." Then she heard gunfire. She ran to the corner. She did not see who fired the gun that killed the victim. She did not see the defendant or Marshall.

The defendant's statement of the circumstances to the police presented a much different version from that of the state. The defendant admitted that he was present when the homicide occurred at Newhall and Read Streets and that he had then known the victim for about five years. The defendant said that, as he was walking along Read Street and "got around the corner of Newhall, a white [car] drove past me and stopped and backed up." At that time, the defendant was carrying a .44 revolver. He saw four males in the car: Vincent the driver, Gamble on the front passenger side, Marshall in the back behind the driver and the victim behind the front passenger seat. Three of the occupants got out of the car, Marshall did not. The defendant then said that the victim "come in my face," asking the defendant about a bicycle that the victim said the defendant had stolen from him causing the victim a $70 loss. The victim told the defendant to get that money "so then I told him whatever and I was stepping away." The defendant then said, "[a]s I was stepping away I heard gunshots. I got to the nearest backyard which was a house down from where we were standing arguing, and I let off three shots and then I ran." The defendant said he then ran through backyards to Huntington Street,[14] crossed it, went to Bassett Street where his cousin, Kevin Dean, approached him and brought him home.

Later, in his statement, the defendant said that he did not know how the victim was shot "but the way— the way I heard he was shot, he was shot in the chest, and the way that he was towards me I was not in front of him. His back was towards me." Still later in the same statement, the defendant said that Marshall was

---

She saw the victim lying on the street with Gamble and Marshall still there, according to her testimony.

[14] Bassett Street runs generally in an east-west direction, as do Read and Huntington Streets. All three streets are generally parallel to each other, with Bassett Street being two blocks south of Read Street.

firing at him from the car. In his statement to police, however, he said that Marshall was not firing at the defendant when the defendant was talking to the victim. Then, inconsistently, the defendant said he fired his weapon before he took cover. He fired his weapon "towards the car," he "was firing at [Marshall]. I was firing at the car." The defendant, in his statement, answered "[y]es" to Dease's question: "Mr. Harris, so you are telling me that [the victim] was between you and [Marshall] when you were firing the weapon." He denied that he shot the victim and stated that he believed that Marshall, who was firing at the defendant, had shot the victim. The defendant also said that Marshall fired "about four [shots] at [the defendant] but after that I don't know, I left." When he was asked if his cousin, Kevin Dean, was "present when this shooting occurred," the defendant answered, "When the shooting begun [Dean] was nowhere around." When asked, by Dease, "after the shooting when did you meet up with Kevin Dean?" The defendant answered that Dean saw him running down Bassett Street and picked him up and took him home. Immediately thereafter, Dease said: "Mr. Harris, so you are telling me when the shots were fired, Kevin Dean was not standing at the intersection of Newhall and Read?" The defendant answered, "Yes." The defendant also told Dease that he no longer had the pistol that he was "firing at the car with" but that he "took it apart and just threw it away," although he still had the barrel. The defendant, however, did agree during his statement to give the barrel to Dease so that Dease could verify that the defendant's weapon was not the one that killed the victim. When Dease asked the defendant if Vincent said something to someone "before this shooting started," the defendant said that Vincent repeatedly said to Marshall that "[i]t's not worth it" but as Vincent was saying that, "that's when the first shot come out and then the other three shots following, and then I let go my shots which was three." The defendant also said that when the shooting occurred, Gamble

was "by the package store by Read Street." It did not seem to him that Gamble had "any kind of weapon" and that Marshall and the defendant were the only persons in possession of any type of weapon. At the end of his statement to Dease,[15] when asked if there was anything else that he would like to tell about this homicide, the defendant said: "The main thing is that [Marshall] was also shooting too, the—the way that [the victim] was facing was towards his own boy, the way I think it happened he got caught in the crossfire. He was trying to make it back to the car and [Marshall] shot him by accident."

In considering the defendant's claims on appeal on this branch of the case we consider his basic posture. He denied that he killed the victim. He argues, however, that, if the jury found that he did kill the victim, then he was legally justified in doing so because he did so in self-defense[16] or in defense of another. He maintains that, by a proper request to charge, he not only raised self-defense at the trial but also that he raised defense of another and that evidence existed to justify a jury instruction on each theory. The state argues that defense of another was not properly raised by an appropriate request to charge, that the defendant never properly excepted to the failure of the court to charge on it, that neither *Evans-Golding* or plain error review is appropriate, that the evidence was insufficient to justify such an instruction, and that, if there was any error, it was harmless.

In reviewing the defendant's claim, we get guidance from the following principles. "When a defendant admits the commission of the crime charged but seeks

---

[15] Dease testified at the trial.

[16] It is not in dispute that the defendant raised the issue of self-defense, that he filed a proper request to charge on it, that there was evidence to support that theory and that the trial court charged the jury correctly on self-defense.

to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate." *State* v. *Rosado*, 178 Conn. 704, 707, 425 A.2d 108 (1979). If the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction. Id., 707–708. "[A] defendant is 'entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . .' *United States* v. *Platt*, 435 F.2d 789, 792 (2d Cir. 1970), quoting *United States* v. *O'Connor*, 237 F.2d 466, 474 n.8 (2d Cir. 1956)." *United States* v. *Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976). "A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) . . . ." (Citations omitted.) *State* v. *Miller*, 186 Conn. 654, 660, 443 A.2d 906 (1982). Where the legislature has created a legally recognized defense, in this case justification, this fundamental constitutional right includes a proper jury instruction on the elements of the defense of justification so that the jury may ascertain whether the state has met its burden of disproving it beyond a reasonable doubt. *State* v. *Adams*, 225 Conn. 270, 280–81, 623 A.2d 42 (1993); *State* v. *Miller*, supra, 660–61.

As indicated, the defendant claims that he preserved the defense of another by filing an appropriate request to charge and by taking an exception to the court's refusal to charge. We do not consider this long request[17]

---

[17] The defendant filed the following request to charge on justification:

"XI. JUSTIFICATION

"1. Introduction

"If, after weighing and sifting all of the evidence, you believe that the State has proved all of the elements of the crimes charge (or one of the lesser included offenses) you must still consider the evidence regarding self-defense and defense of others.

"2. Burden of Proof in Self-Defense

"a. There is evidence in this case indicating that Marcus Harris was acting in self-defense. I now instruct you that our law recognizes that self-defense is a proper and complete defense to all the charges which have been lodged against him. Marcus Harris is not required to prove that he acted in self-defense. Once the issue of self-defense or defense of others is raised, then the State must prove beyond a reasonable doubt that he did not act in self-defense or in defense of others. If you have any reasonable doubt about whether or not Marcus Harris was acting in self-defense or in defense of others, then you *must* find him not guilty. Self-defense or defense of others is inconsistent with guilt of any of the crimes with which Marcus Harris has been charged. Since evidence of self-defense or defense of others has come into this case, the State has the burden of negating self-defense or defense of others as part of its overall burden of proving guilt beyond a reasonable doubt. Therefore, if you have a reasonable doubt arising out of the issue of self-defense or defense of others, you must find Marcus Harris not guilty. Sec. 53a-12; *State* v. *Jenkins*, 158 Conn. [149, 256 A.2d 223 (1969)]; *State* v. *Garrison*, 199 Conn. [383, 507 A.2d 467] (1986); *State* v. *Williams*, 25 Conn. App. [456, 595 A.2d 895] (1991).

"3. Introduction to Self-Defense

"Under our law, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force. Furthermore, an individual is entitled to use deadly physical force upon another person if he reasonably believes that that other person is using or is about to use deadly physical force or is inflicting or is about to inflict great bodily harm. Under such circumstances, the use of deadly physical force is reasonable. Officer Dease testified that Marcus Harris in his statement to Detective Dease believed that Robert Marshall and others [were] about to inflict great bodily harm and were about to use deadly physical force upon him. In this, if Marcus Harris reasonably believed that they were using or were about to use deadly physical force or that they were inflicting or were about to inflict great bodily harm, then Marcus Harris had the right to use deadly physical force, including the use of a gun. The question is not whether you believe, in retrospect, that the use of force was necessary. The question is whether Marcus Harris, under the circumstances as they appeared to him at the time of the incident, actually believed he was in danger of great bodily harm and could reasonably hold that belief. Sec. 53a-18; Sec. 53a-19.

"4. False Appearances

"a. If Marcus Harris actually believed and had reasonable grounds to believe that Robert Marshall and others [were] using or were about to use deadly physical force on him or that they were inflicting or were about to inflict great bodily harm on him and that deadly physical force was necessary to repel such danger, he would have been justified in using deadly physical force upon his assailants in self-defense, even though it afterwards may

have turned out that the appearances were false. The point of view you must judge is the accused's and what appeared reasonable to him. What they intended is irrelevant to your consideration. If Marcus Harris actually believed that Robert Marshall and others [were] using or about to use deadly physical force on him or that they were inflicting or about to inflict great bodily harm on him and such a belief was reasonable in light of all the circumstances as you know them, then the law justifies the use of deadly physical force by Marcus Harris even though there was in fact no intent on the part of the assailants to use deadly physical force or to inflict great bodily harm on him. N.Y. Pattern Jury Instructions, Form No. 75.

"b. As I have stated, it need not be established that Robert Marshall and others actually used or were about to use deadly physical force or were inflicting or about to inflict great bodily harm. You must look simply at what was a reasonable belief to the accused under all the circumstances. N.Y. Pattern Jury Instructions, Form No. 75.

"c. In determining self-defense, you must, as I have said, consider the facts as they reasonably appeared to Marcus Harris at the time he acted. You can consider words, actions and gestures. You must put yourself in the place Marcus Harris found himself and determine whether he could reasonably believe that Robert Marshall and others [were] using or about to use deadly physical force or were inflicting or were about to inflict great bodily harm. See *State* v. *Croom*, 166 Conn. 226, 229 [348 A.2d 556] (1974).

"5. Burden of Proof on Self-Defense

"Because I have been talking so much about your duty to judge whether the accused believed that he was being attacked was reasonable, you may be getting the impression that in order to find that the accused acted in self-defense, he has to convince you that he had a reasonable fear of immediate bodily harm. Nothing could be farther from the truth. The burden is on the State to prove to you that the accused did not act in self-defense. This means that if you have a reasonable doubt about any of the elements of self-defense, then you must find Marcus Harris not guilty. Sec. 53a-12.

"6. Deadly Physical Force

"a. Deadly physical force is considered reasonable physical force in some instances. It is defined as 'physical force which can be reasonably expected to cause death or serious physical injury.' Sec. 53a-3 (5), Conn. Gen. Stat.

"b. You may also find that the use of deadly physical force upon other persons was a reasonable use of force if Marcus Harris actually believed and had reasonable grounds to believe that others were using or about to use deadly physical force upon him; were inflicting or about to inflict great bodily harm on him or his friend; Sec. 53a-13 [§ 53a-19, § 53a-20].

"c. The question whether his belief that Robert Marshall and others [were] about to use physical force on him was reasonable in light of all the circumstances, the State must prove to you beyond a reasonable doubt that such a belief by Marcus Harris was unreasonable. He does not have to convince you that such a belief was reasonable. If you have a reasonable doubt about whether his belief that he was about to be the victim of physical force, and

a proper request under Practice Book § 854. It did not set out "the evidence to which the proposition would apply." Practice Book § 854. That alone makes it improper under Practice Book § 854 as it existed at the

---

being shot at would be physical force, then you must find him not guilty. Proof beyond a reasonable doubt, remember, is proof which excludes every reasonable hypothesis, every reasonable theory, every reasonable construction of the evidence consistent with innocence. And if you, at the end of your deliberations, still have a reasonable doubt about whether Marcus Harris' belief that he was about to be the victim of physical force was reasonable, then you must find him not guilty.

"d. On the second question, whether the amount of force he used was reasonable (and we are assuming for the moment that you believe that Marcus Harris intended to use his gun does not constitute deadly physical force), Marcus Harris does not have to prove to you that the amount of force he used was reasonable; the State must prove to you beyond a reasonable doubt that the amount of force was unreasonable. Therefore, if you have a reasonable doubt about whether the amount of force used was reasonable, you must find Marcus Harris not guilty. Sec. 53a-19.

"e. The State must prove to you both that his belief was unreasonable and that the amount of force used was unreasonable, and the State must prove both of those elements beyond a reasonable doubt. If you have a reasonable doubt on these questions, you must return a verdict of not guilty. Sec. 53a-12.

"7. Deadly Physical Force (Summary)

"To summarize, then, for you the conditions under which the law considers the use of deadly force to be justified: (1) where the accused reasonably believes his assailants were using or were about to use deadly physical force against him or another person, and (2) where the accused reasonably believes his assailants were inflicting or about to inflict great bodily harm upon him or another person. In these instances, the law considers deadly physical force reasonable.

"If you find that Marcus Harris used deadly physical force, then the State must prove beyond a reasonable doubt that the accused's beliefs were unreasonable and that his actions were unreasonable. In short, the State must prove that Marcus Harris was not acting in self-defense. Sec. 53a-12.

"8. Accident, As Bearing on What Amount of Force Is Reasonable

"As you consider what amount of force is a reasonable amount of force under the circumstances, you must remember not only my instructions that your inquiry is limited to Marcus Harris' reasonable perceptions of what kind of threat was being directed against him and that the actual threat posed by his assailants, in hindsight, is irrelevant. In other words, where a person is acting in self-defense and is justified in using reasonable force to repel an attack, if the attacker or a third person is accidentally killed or injured, that person is not responsible. His actions are excusable under the law. *Morris* v. *Platt*, 32 Conn. 75 (1864)." (Emphasis added.)

time of the defendant's trial.[18] The absence of reference to such evidence is in contrast to other portions of the eight page request on justification where the claimed applicable evidence is set out and specific as to self-defense.[19] Here, the applicable rule required that the

---

[18] In 1995, *after* the defendant's 1994 trial, the words "if requested by the judicial authority," were added just before "the evidence to which the proposition would apply." This amendment took place on June 23, 1995 to take effect October 1, 1995.

Practice Book § 854, since 1995, has provided the following: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based and, if requested by the judicial authority, the evidence to which the proposition would apply. Requests to charge should not exceed fifteen in number unless, for good cause shown, the court permits the filing of an additional number. If the request is granted, the judicial authority shall apply the proposition of law to the facts of the case.

"A principle of law should be stated in but one request and in but one way."

[19] There are several examples of specific references in the defendant's request to charge. In paragraph 2 of that request, entitled "Introduction to Self-Defense," the defendant talks of the justification of a person using reasonable physical force "upon another person to defend himself or a third person from what he reasonable believes to be the use or imminent use of force. . . ." The only evidence, however, referred to is testimony of Dease, based on the defendant's statement to Dease, which mentions only what the defendant himself could believe as to the deadly physical force used or about to be used by Marshall "and others" on the defendant and not on any other person. We note, parenthetically, that Dean, who is now said to be the other person in whose defense the defendant allegedly acted is never mentioned at all by name throughout the defendant's *entire* request on justification.

With reference to paragraph 4a of the request entitled "False Appearances" concerning the reasonableness of the defendant's belief that would justify the use of "deadly physical force," the request refers only to "Robert Marshall and others . . . using or about to use deadly physical force on [the defendant] . . . ." The same applies to paragraphs 4b and 4c, which make up the balance of paragraph 4.

Fairness suggests that we point out that the defendant did request that the jury be charged as follows: "You may also find that the use of deadly physical force upon other persons was a reasonable use of force if Marcus Harris actually believed and had reasonable grounds to believe that others were using or about to use deadly physical force upon him; were inflicting or about to inflict great bodily harm to him or his friend." This is the closest the request ever comes to putting Dean in the case insofar as being "another

evidentiary basis to which the theory of defense of another applied be set out in the request. When it is considered that "the purpose of giving instructions is to inform the jurors of the essential issues before them and of the various permissible ways of resolving those issues"; *United States* v. *Montgomery*, 819 F.2d 847, 851 (8th Cir. 1987); the defendant's obligation under the applicable rule of practice is clear. If the defendant could refer to evidence including names of those persons who figured in his claim of self-defense, he should have done so with reference to his defense of another claim.

The defendant argues that in any event the trial court was alerted to his defense of another theory at the time of the charge conference.[20] That appears to be correct but, after that conference, defense counsel referred to no evidence on the record, on which reliance was placed. Cf. *State* v. *Arena*, 235 Conn. 67, 76, 663 A.2d 972 (1995). We recognize that "form" has been said to be the antithesis of "substance." See *Boothe Financial Corp.* v. *Loretto Block, Inc.*, 97 N.M. 496, 499, 641 P.2d 527 (1982). The circumstances here do not elevate form over substance—the rules should have been followed.

Our Supreme Court has spoken to this rule, and specifically to Practice Book § 854, in *State* v. *Tomasko*, 238 Conn. 253, 262, 681 A.2d 922 (1996). *Tomasko* involved an appeal from a conviction of murder in violation of General Statutes § 53a-54a (a) in which the

person" in whose defense the defendant allegedly used "deadly physical force." This is never, in the defendant's request, related to any of the evidence. Furthermore, the victim, Spruill, is not only not mentioned by name anywhere in the request to charge, but a fair reading of it does not disclose reference to that portion of the state's version (upon which the defendant relies) that intimates the claimed aggressiveness or boldness that the victim allegedly conveyed to Dean that reasonably suggested the victim was a threat to Dean.

[20] Apparently, a charge conference took place in chambers and thereafter certain comments concerning it were stated on the record.

Supreme Court affirmed, inter alia, the trial court's refusal to charge on the lesser included crime of criminally negligent homicide because the defendant's request to charge constituted a mere general statement of the entire incident at issue and did not comply with § 854, which required, inter alia, the essential facts to warrant instruction on that crime. Id., 261–63. Specifically, the *Tomasko* court, quoting *State* v. *Hall*, 213 Conn. 579, 593, 569 A.2d 534 (1990), stated: "While this court does not favor unyielding adherence to rules of procedure where the interests of justice are thereby disserved . . . the ever increasing refinement of our law justifies cooperation of counsel in stating requests for jury instruction. The minor burden of cooperation imposed by [Practice Book § 854] is neither unreasonable nor novel." (Internal quotation marks omitted.) *State* v. *Tomasko*, supra, 262.

After the trial court completed its instructions to the jury, it asked if there were any exceptions. At that time, defense counsel said, "I'll except to my justification charge not being given in total." The trial court then asked, "Just in total, no particular area?" There was no response to the court's query.

Because we have decided that the defendant has not preserved his jury instruction request, we take up now his claim that that claim should be reviewed under the *Evans-Golding* doctrine.

"Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error 'only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of

the alleged constitutional violation beyond a reasonable doubt.' [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 623 (1989)]." *State* v. *Graham*, 33 Conn. App. 432, 441–42, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994). "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." *State* v. *Newton*, 8 Conn. App. 528, 531, 513 A.2d 1261 (1986); see also *State* v. *Thurman*, 10 Conn. App. 302, 306, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987). The first two conditions of *Golding* are satisfied here. First, the record is adequate to review the alleged claim of error. Second, the right to establish a defense is constitutional in nature. *Washington* v. *Texas*, supra, 388 U.S. 19; *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986); *State* v. *Peters*, 40 Conn. App. 805, 808–809, 673 A.2d 1158, cert. denied, 237 Conn. 925, 677 A.2d 949 (1996). This court has stated that " '[w]e are free . . . to dispose of the claim by focusing on the condition that appears most relevant under the circumstances of the case.' " *State* v. *Krzywicki*, 39 Conn. App. 832, 836, 668 A.2d 387 (1995), quoting *State* v. *Andrews*, 29 Conn. App. 533, 537, 616 A.2d 1148 (1992), cert. denied, 224 Conn. 924, 618 A.2d 531 (1993); see *State* v. *Pinnock*, 220 Conn. 765, 778, 601 A.2d 521 (1992); *State* v. *Golding*, supra, 240; *State* v. *Dukes*, 29 Conn. App. 409, 418, 616 A.2d 800 (1992), cert. denied, 224 Conn. 928, 619 A.2d 851 (1993).

In asserting that the evidence must be construed in the light most favorable to an instruction of the justified use of deadly force in defense of another, the defendant argues that the jury could reasonably have found the following facts and made the following inferences: "The victim and his three friends were outside their car talking when Harris and Dean drove by. Immediately they all proceeded to get in the Mustang and to follow Harris and Dean a short distance when they stopped in

response to Dean who was now on the sidewalk. From their response, it can be inferred that some preexisting hostility existed between the victim, his friends and [the] defendant and Dean.

"All three witnesses at trial who saw the shooting stated that Dean asked the group in the Mustang to pull over so that Dean could speak with the victim. The victim got out and approached Dean. All agreed that Dean, who had asked to speak with the victim, suddenly started to back away from him while motioning with his hands for the victim to stay away. Dean then began to defensively threaten the use of force. Each witness described Dean as reaching behind his back as if for a gun. Indeed, they all testified that they believed that Dean did have a gun and that something was going to happen. Despite being told to stay away and despite Dean's threatening act of reaching behind his back for a gun, the victim continued to approach Dean, coming within inches of him and repeating to him, 'What's up?' "

The defendant then argues: "The question for the jury and for Harris was what did that conduct tell you about the victim's intent that night? They might well have asked themselves: Why should the victim approach someone who is reaching for a gun? They might well have answered: Because he had a gun. To be sure that was not the only conclusion to be drawn but the question for the jury was whether it was a reasonable conclusion for Harris to have drawn that night. From this testimony it could reasonably be inferred that Dean was in fear of deadly physical force from the victim and that Harris did so infer it."

Continuing, the defendant claims that he "was positioned a short distance away facing Dean's back and the victim's face. He was clearly in a position to see Dean's fearful reaction and the victim's bold approach to Dean in the face of Dean's threatening reach for a

gun. [He] was also in a position to know that Dean did not have a gun for he had been with Dean that evening and could see Dean's back as Dean pretended to reach there for a gun." Thus, the defendant claims that he could have reasonably inferred that Dean was unarmed but threatening the use of deadly physical force against the victim and that the victim continued to approach as if he, the victim, were armed. The defendant also claims that "the jury would have been justified on this evidence in concluding that [the defendant] believed that his unarmed cousin was being threatened with the use of deadly physical force by the victim, that it was necessary for him to respond in his cousin's defense with deadly force against the victim and that such a belief was reasonable under all the circumstances."[21]

The state, confronted on appeal with the defendant's defense of another theory, argues not only that this defense "lacks a factual basis, but [that it] misrepresents the record, for the evidence was insufficient to support it. In effect, the defendant has distorted the record to create a version of events on appeal which was never presented at trial." While it is true that a defendant is entitled to have instructions given " 'relating to any theory of defense for which there is any foundation

---

[21] At this point the defendant also states in his brief: "There was no statement by [the defendant] indicating a reason for shooting the victim. [The defendant] was not involved in any confrontation with the victim *under any scenario presented by the evidence.* No witness knew of any problem between the two. A reasonable explanation for why Harris would shoot the victim given the victim's confrontation with Dean was that Harris intervened to defend his cousin. Again the question for this court is whether it was a possible inference for the jury to draw, not the only one or the most likely one." (Emphasis added.)

Even assuming no witness knew of any problems between the defendant and the victim, and even assuming that there was no statement by the defendant indicating a reason for shooting, this statement is inaccurate. In his statement to the police, the defendant, by his own admission, indicated that he was involved on that very night in a confrontation with the victim over a bicycle.

in the evidence, no matter how weak or incredible' ";
*United States* v. *Platt,* supra, 435 F.2d 792; *State* v.
*Fuller,* supra, 199 Conn. 278; a jury cannot resort to
speculation. See, e.g., *State* v. *Belle,* 215 Conn. 257,
275, 576 A.2d 139 (1990). This, of course, includes the
proscription against the jury resorting to speculation
and conjecture in drawing reasonable inferences. *State*
v. *Little,* 194 Conn. 665, 673, 485 A.2d 913 (1984); *State*
v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982).

The defendant argues that the evidence supports a
theory involving defense of another. We ascertain from
the defendant's brief that we must first understand cer-
tain separate assumptions on which this "evidence" is
based. To accept this theory, it is apparent that we must
accept *all* of these assumptions as having an adequate
basis in the evidence. These assumptions are (1) that
there was a state of hostility between the victim and
his companions and Dean and the defendant, (2) that
Dean was unarmed, (3) that the defendant knew that
Dean was unarmed, (4) that the victim believed that
Dean was armed, (5) that the defendant reasonably
believed that the victim believed that Dean was armed,
(6) that the victim was threatening the use of deadly
physical force toward Dean and (7) that the defendant
reasonably believed that the victim was armed.

A review of these assumptions demonstrates the
groundlessness of the defendant's defense of another
theory. The first assumption involves an inference of
"preexisting hostility" between the victim and his com-
panions, on one side, and Dean and the defendant on
the other. This state of hostility can be inferred, claims
the defendant, because, after the defendant and Dean
drove by and the victim, Gamble, Marshall and Vincent
got in the Mustang, the Mustang followed them and
stopped in response to Dean's invitation to do so. The
defendant claims that, from this "response" of the occu-
pants of the Mustang, "it can be inferred that some

preexisting hostility existed between the victim, his friends and Harris and Dean." This is sheer speculation and has no basis in the evidence presented.

The second and third assumptions, that Dean was unarmed and that the defendant knew that he was unarmed, are similarly unsupported by any evidence. The defendant claims that he knew Dean was unarmed because he had been with Dean earlier during the evening of the shooting. The evidence was that the defendant had been with Dean in a car minutes before the shooting. There is no indication how long the defendant had been with Dean that evening except for those few minutes before the shooting and there is no evidence to suggest even that the defendant learned during that time whether Dean was armed or unarmed. The suggested inference that the defendant knew Dean did not have a gun could not be taken. A court cannot supply evidence that is lacking. See *State* v. *Harris*, supra, 188 Conn. 581.

The defendant claims that the victim believed that Dean was armed and that the defendant reasonably believed that this was so. These assumptions follow, claim the defendant, from the fact that the victim continued a "bold" and "aggressive" advance toward Dean when Dean, pretending to reach for a weapon, told the victim not to. The idea, it is presumed, is that the only reason the victim would advance in such a manner is if he, too, was armed. There is not a scintilla of evidence to support this theory. To say, as the defendant does, that the victim's approach to Dean was "bold" and "aggressive" in the face of Dean's conduct is to make statements that have *no* foundation in the record.

The key to the defendant's argument is that there was some evidence to provide the defendant with a reasonable basis for believing the victim posed a serious threat to Dean. None of the witnesses said that the

victim posed any threat to Dean, let alone threatened him with deadly physical force. No evidence affords any reasonable inference that the victim was armed. There was testimony that Dean told the victim not to come too close, that Dean moved back from the victim, and that Dean was reaching behind his back as if to "arm" himself. The evidence was that, when Dean refused to talk with the victim, the victim turned away from Dean, telling Dean that, if he was going to shoot, he would have to shoot him in the back. The evidence was uncontroverted that the victim had begun to walk away from Dean when he was shot. The defendant, we submit, is trying to pile speculation on top of conjecture, by proffering in his brief that, from his assumptions, the defendant "could have reasonably inferred that Dean was *unarmed* but threatening the use of deadly physical force against the victim and that the victim continued to approach as if [the victim] was armed." (Emphasis added.) It is beyond reason to infer that the victim, walking away and with his back to Dean, posed any threat to Dean, let alone a threat of deadly force.

A jury may draw rational inferences founded on the evidence; it may not resort to speculation and conjecture. *State* v. *Little,* supra, 194 Conn. 673; *State* v. *Kish,* supra, 186 Conn. 768. The defendant's claim requires resort to speculation and conjecture. With no evidence to support these assumptions, the defendant's claim, that this theory should have been presented to the jury, fails.

In the context of the defendant's defense of another theory, there is no question that a defendant bears the initial burden of producing enough evidence to inject it into the case. See *State* v. *Lewis,* 220 Conn. 602, 619, 600 A.2d 1330 (1991); *State* v. *Bailey,* 209 Conn. 322, 335, 551 A.2d 1206 (1988). "To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient to raise a reasonable doubt

in the mind of a rational juror as to whether the defendant acted in self-defense. *State* v. *Cassino*, 188 Conn. 237, 243, 449 A.2d 154 (1982); *State* v. *Folson*, 10 Conn. App. 643, 647, 525 A.2d 126 (1987)." *State* v. *Carter*, 232 Conn. 537, 545, 656 A.2d 657 (1995). "The trial court should not submit an issue to the jury that is unsupported by the facts in evidence." *State* v. *Adams*, supra, 225 Conn. 283; see *State* v. *Santangelo*, 205 Conn. 578, 594, 534 A.2d 1175 (1987); *State* v. *Rodgers*, 198 Conn. 53, 56, 502 A.2d 360 (1985). Once, however, self-defense or defense of another is an issue, the state must disprove it beyond a reasonable doubt. See General Statutes § 53a-12 (a); *State* v. *Bailey*, supra, 335. As *Bailey* states, however, "[a]s a practical matter . . . the defendant controls the shape and direction of a self-defense claim. The state must apply its proof to factual circumstances raised or illuminated by the defendant." Id. This applies as well to a defense of a "third person" or of "another person" under General Statutes § 53a-19. In this case, the defendant has not sustained his initial burden, minimal though it is, of injecting his defense of another theory into the case by evidence sufficient to do so. It follows from what we said that the defendant has not met the third condition of *Golding*, i.e., that the claimed constitutional violation clearly exists and clearly deprived him of a fair trial. *State* v. *Golding*, supra, 213 Conn. 239–40.[22]

---

[22] The defendant also now claims that the trial court "undertook to instruct on the use of force in defense of another but did so incorrectly by not telling the jury that it applied to any use of deadly force" and that having decided to instruct on the use of force to defend another, the court was "constitutionally compelled to do it correctly." He says that this claim falls squarely within *State* v. *Preyer*, 198 Conn. 190, 502 A.2d 858 (1985). We do not agree.

We recognize that "[a] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the [crime] was not justified." (Citations omitted.) *State* v. *Miller*, supra, 186 Conn. 660–61. The trial court discharged its duty in this case by properly instructing on the

In asserting the reviewability of his defense of another theory, the defendant alternatively claims that the plain error doctrine applies. We do not agree. It is well established that "plain error 'review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.'. . . *State* v. *Wright*, 207 Conn. 276, 288–89, 542 A.2d 299 (1988); *State* v. *Miller*, 202 Conn. 463, 469, 522 A.2d 249 (1987)." *State* v. *Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992); *State* v. *Crump*, 43 Conn. App. 252, 261, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996); see Practice Book § 4061. Where a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine cannot prevail. *State* v. *Thomas*, 214 Conn. 118, 120–21, 570 A.2d 1123 (1990); *State* v. *Miller*, supra, 202 Conn. 469; *State* v. *Hinckley*, 198 Conn. 77, 87, 502 A.2d 388 (1985). In this case, there was no court action resulting in any manifest injustice. What is manifest is that the defen-

defendant's claim of self-defense, the only theory of defense based upon the evidence. As we have already determined, there was not evidence in the case by which the defense of another was appropriately raised. Moreover, contrary to his claim, the trial court, unlike the trial court in *Preyer*, did not undertake to charge on that theory.

It is axiomatic that we examine the charge as a whole. See, e.g., *State* v. *Harris*, 172 Conn. 223, 227, 374 A.2d 203 (1977). It is true that the trial court, during its charge on justification, which alone encompassed some eight pages in its instructions of over forty pages, did refer to "another person" several times. It is also quite clear, however, that that theory was not charged upon. In the context of the extensive charge, there is no reasonable possibility that such inadvertences misled the jury. See *State* v. *Fleming*, 198 Conn. 255, 270, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); see also *State* v. *Brown*, 199 Conn. 14, 26, 27, 505 A.2d 690 (1986); *State* v. *Harris*, supra, 227. The court's instructions on justification were " 'correct in the law, adapted to the issues and sufficient to guide the jury.' *State* v. *Cooper*, 182 Conn. 207, 211, 438 A.2d 418 (1980)." *State* v. *Shaw*, 185 Conn. 372, 383, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); *State* v. *DeJesus*, 194 Conn. 376, 392, 481 A.2d 1277 (1984).

dant received a fair trial, and, therefore, the plain error doctrine is simply not applicable in the circumstances of this case.

The judgment is affirmed.

In this opinion the other judges concurred.