## STATE OF CONNECTICUT *v.* JAMES R. DARROW
### (AC 28864)

Harper, Robinson and Borden, Js.

Argued January 9—officially released April 22, 2008

*G. Douglas Nash*, special public defender, for the appellant (defendant).

*John P. Gravalec-Pannone*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, James R. Darrow, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes

§ 53a-54a.[1] On appeal, the defendant claims that the trial court improperly declined to instruct the jury on self-defense, defense of premises and defense of property. We agree that the defendant was entitled to a self-defense instruction and, therefore, reverse the judgment of the trial court.[2]

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In the mid-1990s, the defendant was involved in a romantic relationship with Sharon Benoit, a married woman. After Benoit ended her relationship with the defendant in March, 1997, he had a meeting with her husband, Donald Benoit. During that meeting, the defendant told Donald Benoit that Sharon Benoit had been planning to have Donald Benoit murdered. Donald Benoit reported this information to the police. During his investigation into Donald Benoit's complaint, Joseph Russo of the Norwich police department learned that the defendant admitted to Sharon Benoit that he had killed John Avery in the 1980s. Shortly thereafter, Russo alerted state police Detective Steven Rief of the possible murder.

Relying on Russo's information, Rief and his partner, Richard Bedard, interviewed the defendant's sister, Lynn Darrow (Darrow), and his cousin, Bruce Richard. Details of the victim's life emerged, but little was

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] The defendant claims that the court improperly denied his request for an instruction on defense of premises and defense of property. Specifically, he argues that because the victim illegally entered the premises, he was not required to retreat and "had the right to use deadly physical force under this form of justification because it was appropriate under the rules of self-defense." (Internal quotation marks omitted.) The defendant does not offer any discussion of legal authority to support these claims independently and separately from his claim concerning an instruction on self-defense. We therefore consider the claims inadequately briefed and decline to afford them review. See *State* v. *Carocoglia*, 95 Conn. App. 95, 129, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006).

revealed of his final moments. In the summer of 1984, Darrow first met the victim, Avery, on a dairy farm where they both worked. Darrow and the victim had a romantic relationship, and the victim moved in with the Darrow family in October, 1984. Because they were having "relationship problems and [the victim] was drinking and using drugs," Darrow asked the victim to move out of her family's house in April, 1985. One week later, Darrow discovered that she was pregnant with the victim's child. In May, 1985, the victim told Darrow he was leaving but would be back before the baby was born. Darrow never saw the victim again. In 1996, Darrow learned from Richard that on an autumn day long ago, the defendant told Richard that he had killed the victim and buried the body in Peck Hollow in Franklin. Neither Darrow nor Richard believed that the defendant had killed the victim because he was known for telling stories. Darrow and Richard never reported the information to the police prior to their interviews with Rief and Bedard.

Rief and Bedard then interviewed the defendant and obtained at least three confessions. The defendant was arrested. After a search, police investigators found the victim's remains in Peck Hollow. In a postmortem report, the medical examiner determined the cause of death to be blunt traumatic head injury. The jury found the defendant guilty of murder, and the court sentenced him to forty years incarceration. This appeal followed.

On appeal, the defendant claims that the court improperly denied his request to instruct the jury on the defense of self-defense.[3] He argues that there was sufficient evidence presented at trial to warrant a self-defense instruction, and, therefore, he was entitled, as a matter of law, to have the jury informed of the availability and the elements of self-defense. We agree with the defendant.

---

[3] See footnote 2.

"It is true that [i]f the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction." (Internal quotation marks omitted.) *State* v. *Cruz*, 75 Conn. App. 500, 510, 816 A.2d 683 (2003), aff'd, 269 Conn. 97, 848 A.2d 445 (2004). Self-defense is a recognized legal defense. See General Statutes (Rev. to 1985) § 53a-19.[4] A defendant is entitled to a proper instruction on self-defense for which there is foundation in evidence, no matter how weak or incredible. *State* v. *Harris*, 46 Conn. App. 216, 236, 700 A.2d 1161, cert. denied, 243 Conn. 930, 701 A.2d 662 (1997). A defendant's initial burden is slight, for he has no burden of persuasion; he merely has to introduce

[4] Self-defense is defined in General Statutes (Rev. to 1985) § 53a-19, which provides: "(a) Except as provided in subsections (b) and (c), a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

sufficient evidence to warrant presenting his claim of self-defense to the jury. *State* v. *Ramos*, 271 Conn. 785, 800, 860 A.2d 249 (2004); *State* v. *Singleton*, 97 Conn. App. 679, 691, 905 A.2d 725, cert. granted on other grounds, 280 Conn. 949, 912 A.2d 484 (2006). Thus, "[a] court should view the evidence most favorably to the defendant and should give the charge if the evidence is sufficient, if credited by the jury, to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense." *State* v. *Terwilliger*, 105 Conn. App. 219, 224 n.5, 937 A.2d 735, cert. granted on other grounds, 286 Conn. 902, 943 A.2d 1103 (2008).

The following additional facts are necessary to our resolution of the issue. The defendant provided three versions of the murder, set forth in two written confessions and one oral confession.[5] In his first written confession, the defendant stated that he came home from ice fishing in February or March, 1985 or 1986, to find the victim stealing two guns and some money. The defendant "was very pissed off because [the victim] had broken into the house." The victim was "headed out" the door when the defendant "caught" him. The defendant pushed the victim into the ground, smashing his head against the cement floor, resulting in "a pretty good crease" in the victim's head. The defendant then grabbed both of the victim's arms and pulled them back until they "popped." He then bound and gagged the victim. After the defendant cleaned the victim's blood from the floor, he put the victim in his truck. At this point, the victim was "busted up" and "didn't have a chance." The defendant then drove the victim to a nearby gasoline station, from which he called a drug dealer known as "Purple." Purple told the defendant that his "boss Thomas" would meet the defendant at another gasoline station. The defendant then drove his truck and parked it in a cornfield. Here, he told the

---

[5] All of the defendant's confessions were given at the same time.

victim that he was "giving him up to Thomas."[6] The victim, conscious at this point, pleaded with the defendant to not "give him up." As arranged, the defendant gave the victim to Thomas to settle his drug debt, and he never saw or heard from the victim again.

According to the defendant's second written confession, he came home from fishing one afternoon in February or March, 1985, when he encountered the victim in his basement "packing money and guns and stuff into bags." The victim stabbed the defendant in the right forearm with a knife before the defendant "slammed him into the floor." The defendant then bent both of the victims' arms over the defendant's knee until he heard them "pop at the elbow." The defendant then bound and gagged the "semiconscious" victim. He then carried the victim along the railroad tracks behind the Darrows' house. The defendant "was pissed off because what [the victim] had done to [him]," and he had "snapped and all [he] could see was blood because [he] was so pissed off." The defendant then made the victim walk in front of him, and he told the victim that he would beat him and leave him in a wooded area. When the victim kicked the defendant and called Lynn Darrow a "whore," the defendant hit the victim in the face with a limb from a tree. The victim became "mush" and "started gurgling into the mud." The defendant pushed the victim with his hands, and the victim sunk into the swamp at Peck Hollow.

At trial, Rief testified that the defendant made at least one other confession. The following colloquy occurred:

"[Defense Counsel]: In fact, you heard other versions of what happened that you didn't include in either of these written statements; isn't that true?

---

[6] At trial, Rief testified that because they did not believe the story, he and Bedard did not investigate the identities of Purple or Thomas, whether a drug debt existed or why "giving up" the victim would "settle" the debt.

"[The Witness]: That is true. . . .

"[Defense Counsel]: Did [the defendant] tell you at one time that he caught [the victim] stealing from the home, that in the process of catching him, they had some kind of struggle and that [the victim] hit his head on the floor, on the cement floor, and that he carried [the victim's] body all the way to his burial place? Didn't he tell you that?

"[The Witness]: Yes, he did."

Consistent with Rief's testimony that the defendant confessed to killing the victim in his home, Sharon Benoit testified that the defendant told her that "he had killed [the victim] and taken his body thirteen miles and buried him in the woods." Additionally, Harold Wayne Carver II, the state's chief medical examiner, testified that it was unusual but possible that the victim sustained his mortal injury when his head struck a hard piece of wood on the basement's cement floor.

Before the court denied the defendant's request for a self-defense charge,[7] it correctly noted that "in order for there to be a self-defense claim, the killing would have to take place . . . at the residence." The court, however, declined to instruct on self-defense, explaining: "What concerns me here is the following, and one of the reasons why this court did not give justification because I think it would be confusing to the jury. . . . We are asking the jury whether [the defendant] reasonably believes [that] the use of imminent physical force was necessary [and], in my opinion, they cannot make these determinations from the fact that [the victim] is stealing and the fact that it is at [the

---

[7] The defendant submitted a written request for a jury instruction on self-defense. Therefore, he adequately preserved this issue for appeal. See *State v. Sivak*, 84 Conn. App. 105, 111, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). Also, immediately after the charge to the jury, the defendant took exception to the court's failure to charge on self-defense.

defendant's] home. . . . I feel that there is no way we can ask the jury to infer [the defendant's] state of mind from . . . the dearth of facts that were provided."

We conclude that no matter how weak or incredible the evidence was, the defendant met his burden of providing an evidentiary foundation to inject the issue of self-defense into the case. Evidence that the defendant killed the victim in his home during the altercation was sufficient to boost the defendant over the requisite evidentiary threshold. "Upon a valid claim of self-defense, a defendant is entitled to proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the [murder] was not justified." (Internal quotation marks omitted.) *State* v. *Singleton*, supra, 97 Conn. App. 692. Therefore, the defendant was entitled to a self-defense instruction as a matter of law.

We next address the court's reasoning that "to give a self-defense [charge] would be to ignore [the version of the confession], which came in later in time, and . . . supersedes [the version of the confession], which came in prior in time because [the defendant] gave various versions." We emphasize the well settled rule that "[w]hile the preliminary question of admissibility of a confession is for the court, the credibility and weight to be accorded the confession is for the jury." *State* v. *Vaughn*, 171 Conn. 454, 460–61, 370 A.2d 1002 (1976). Though the jury was presented with different versions of the events and multiple confessions, choosing among competing inferences and determining the credibility of the confessions are functions within its exclusive province. *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005) (credibility determinations within exclusive province of jury); *State* v. *Mungroo*, 104 Conn. App. 668, 673, 935 A.2d 229 (2007) (choosing among competing inferences within exclusive province of

jury), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008); see also *State* v. *Martin*, 285 Conn. 135, 148, 939 A.2d 524 (2008) (jury permitted to consider any proven fact in combination with other proven facts and cumulative effect of all evidence presented).

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.