******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* LONNIE ANDERSON
### (AC 42703)

Lavine, Bright and Beach, Js.*

*Syllabus*

Convicted of the crimes of assault in the first degree by means of the discharge of a firearm and assault of a peace officer by means of the discharge of a firearm in connection with his actions in shooting at two state marshals, the defendant appealed to this court. State marshals Q and V arrived at the defendant's residence to serve a capias warrant and take the defendant into custody for failing to appear at a court proceeding. Q and V went to the front door of the defendant's residence and were wearing clothing that identified them as state marshals and they displayed badges. V was in possession of the capias warrant and also was wearing a state marshal's hat. When the defendant came to the door, he provided the marshals with a false name. When the marshals confronted him with his photograph and told him that they would be taking him into custody, the defendant reached back and pulled out a gun. V yelled "gun," and Q and V, who were unarmed, retreated, running in opposite directions. Q received gunshot wounds to his left foot and right forearm, while V was uninjured. Bridgeport police officers arrived on the scene and subdued the defendant. The defendant's brother, L, who was at the residence, testified at trial that Q and V were readily identifiable as state marshals and that he did not observe that the marshals were armed until one of them stepped into the doorway to grab the defendant. Q and V testified that they heard multiple gunshots as they sought cover. On appeal, the defendant claimed that the trial court improperly declined to instruct the jury on self-defense. *Held* that the trial court did not err in rejecting the defendant's request for a jury instruction on self-defense; there was insufficient evidence to raise a question in the mind of a rational juror as to whether the defendant shot at Q and V in self-defense, as Q and V were readily identifiable as state marshals and it was undisputed that, at the time of the shooting, the marshals were in flight away from the defendant and, therefore, the jury could not reasonably have found that it was objectively reasonable for the defendant to believe that Q and V were about to use deadly physical force or inflict great bodily harm and that it was necessary that he shoot at them to prevent such conduct.

Argued May 20—officially released October 20, 2020

*Procedural History*

Substitute information charging the defendant with two counts of the crime of attempt to commit murder, and with one count each of the crimes of assault in the first degree by means of the discharge of a firearm and assault of a peace officer by means of the discharge of a firearm, and with the commission of a class A, B or C felony with a firearm, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Devlin, J.*; verdict and judgment of guilty of assault in the first degree by means of the discharge of a firearm and assault of a peace officer by means of the discharge of a firearm, and the defendant's sentence was enhanced for the commission of a class A, B or C felony with a firearm, and the defendant appealed to this court. *Affirmed.*

*Vishal K. Garg*, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, former state's attorney, and *C. Robert Satti, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Lonnie Anderson, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree by means of the discharge of a firearm in violation of General Statutes § 53a-59 (a) (5)[1] and of assault of a peace officer by means of the discharge of a firearm in violation of General Statutes § 53a-167c (a) (1);[2] his sentence was enhanced pursuant to General Statutes § 53-202k.[3] On appeal, the defendant claims that the trial court improperly declined to instruct the jury on self-defense. We disagree and affirm the judgment of the trial court.

The record reveals the relevant procedural history and facts, which the jury reasonably could have found. On the evening of October 6, 2009, State Marshals Arthur Quinn, Charles Valentino, Joseph Butler, and Richard Krueger went to 434 Indian Avenue in Bridgeport to serve a capias warrant authorizing the marshals to take the defendant into custody for failing to appear at a court proceeding. At approximately 7:45 p.m., the marshals arrived at the residence. Quinn and Valentino went to the front door, and Butler and Krueger went to the rear of the residence. Quinn and Valentino walked up to the residence and knocked on the door. Quinn and Valentino wore clothing that identified them as state marshals and displayed badges. Neither marshal carried a firearm. Valentino was in possession of the capias warrant and wore a utility belt on which were attached handcuffs, gloves, Mace, and a police baton.

An eight year old relative of the defendant answered the door, and the marshals asked to speak with the defendant. The child left and returned with Lyman Anderson, the defendant's brother. Utilizing a photograph of the defendant, Quinn and Valentino recognized that Lyman Anderson was not the subject of the capias. Lyman Anderson then went back into the home, and the defendant came to the front door.

The defendant arrived at the front door armed with a nine millimeter semiautomatic pistol that he kept concealed in his sweatpants. Upon inquiry about his identity, the defendant falsely replied that he was John Anderson. The marshals responded that he was Lonnie Anderson, informed him that he had missed a court date, and stated to him that they had a capias warrant for him. The marshals told the defendant that they intended to take him into custody. The defendant took a step back, drew his pistol, and chambered a round. Valentino spotted the firearm and shouted "[g]un!" The marshals ran off the doorstep and headed in opposite directions.

As they were running away from the defendant's residence, Quinn and Valentino heard several gunshots and Valentino perceived a bullet passing near his head. Valentino heard additional gunshots as he sought cover

behind a parked van. Valentino observed, through the vehicle's windows, the defendant standing on the top step of the stoop and shooting toward Quinn. Valentino also saw the defendant discard an ammunition magazine and reload a second magazine into the pistol.

As Quinn was running, he heard multiple gunshots and felt a bullet hit his left foot. Quinn also sustained a second gunshot wound to his right forearm. A neighbor emerged from his home with a towel to help stop the bleeding from Quinn's arm.

A few minutes later, Bridgeport Police Officer Hugo Stern received a call, via a police broadcast, about the incident. Stern arrived at the Indian Avenue residence and saw uniformed state marshals taking cover near a red vehicle. Stern also observed someone matching the description of the shooter. Stern aimed his gun at that person, who was the defendant, and ordered him to raise his hands. The defendant complied.

As Stern cautiously approached the defendant, he noticed that the defendant wore an empty holster on his right hip. Stern ordered the defendant to lie on the ground slowly, and the defendant complied. Stern directed the defendant to spread his arms and legs on the ground, and the defendant appeared cooperative. After Stern holstered his own weapon and attempted to handcuff the defendant, the defendant resisted by rising into a crouch and acting combative. Stern saw the defendant reach into the waistband of his pants and try to retrieve an item. Bridgeport Police Officer Bobby Jones arrived at the scene subsequent to Stern's arrival and came to Stern's assistance. Both officers subdued the defendant. As the officers rolled the defendant over, they observed that the defendant had been lying on top of a semiautomatic handgun. The officers seized the weapon, and later testing demonstrated that the weapon was the same gun from which several shots had been fired. Additionally, the weapon had been reloaded with a magazine full of cartridges.

In a substitute information, the state charged the defendant with two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), one count of assault in the first degree by means of the discharge of a firearm, one count of assault of a peace officer by means of the discharge of a firearm, and with the commission of class A, B, or C felonies with a firearm in violation of § 53-202k.

On April 25, 2011, the first day of evidence in the defendant's trial, defense counsel filed the following request to charge on self-defense: "Criminal Jury Instructions 2.8-1 Self-Defense and Defense of Others— § 53a-19. In addition to the language in the pattern instruction, we request the following: 'It is a matter of public interest that potential defenders be able to act without fear that they will be criminally liable if they

guess wrong about the person they are defending's rights.' See *Commissioner* v. *Martin*, 369 Mass. 640, 649, 341 N.E.2d 885 (1976). The Connecticut constitution, article I, § 15, protects one's right to carry arms for his own defense and the defense of the State, and presumably for the defense of others. Should you believe that testimony, the fact that the accused might have brought a weapon to the conflict should not have been a factor in the trial court's analysis nor should it affect this court's analysis of the self-defense issue. Under the common law, the fact that a defendant arms himself after an altercation with an aggressor is consistent with self-defense. See, e.g., Bishop, Bishop on Criminal Law, 9th Ed. § 845 at 601 (1923)."

After both parties rested, the court held a charge conference that addressed the requested instruction on self-defense. During the conference, defense counsel, to support the requested charge, relied on the testimony of Lyman Anderson and Bridgeport Detective Mark Belinkie, who had interviewed Lyman Anderson following the defendant's arrest and who also had spoken to Valentino about what had occurred.

Lyman Anderson had provided the following trial testimony relevant to the defendant's requested self-defense charge. The defendant, Lyman Anderson, Lyman Anderson's fiancée, and several acquaintances were using phencyclidine (PCP) and marijuana on the evening of October 6, 2009. Later, in the same evening, Lyman Anderson was eating in the kitchen when he heard radio dispatches going off at the front door. He went to the front door to get his young relative away from the door. Lyman Anderson identified several marshals by their uniforms; he also observed that a marshal was armed, and that the marshals were holding papers. At least one of the marshals was wearing a hat identifying him as a marshal. Lyman Anderson testified that he initially observed approximately four marshals at the front door. He also testified that he originally told the Bridgeport police during a police interview that he had initially observed only two marshals at the front door. He stated that he remembered seeing the defendant come down the stairs and hearing the marshals ask the defendant if he was Lonnie Anderson. Lyman Anderson testified that the defendant provided a false name to the marshals. He also testified that he did not observe that the marshals were armed until a marshal stepped in the door to grab the defendant and testified further that he did not observe the defendant fire a gun. He testified that, during the shooting, he took his nephew away from the gunfire and went to the basement of the residence. He also testified that, after firing at the marshals, the defendant did not want to go outside to surrender because he was concerned that the marshals would fire back at him.

Belinkie testified, relevant to the defendant's request

to charge, that Valentino told him that Quinn tried to grab the defendant before the defendant drew his weapon and began firing.

Defense counsel argued that the testimony of Lyman Anderson and Belinkie was sufficient to support a self-defense charge because the jury reasonably could conclude that the defendant's drug use, coupled with armed men trying to grab him caused the defendant to fear for his life and defend himself with deadly force. Counsel further stated: "Now I—I'd be the first to admit that's not, you know, the strongest evidence out there that I've seen in cases. But I think with the slight standard or no matter how slight, I think, is a language the [cases] . . . used, I would submit that's enough. And I'll just—with those comments, I'll of course—I object if it's not done, but obviously I don't have any further comments."

The state objected to the defendant's requested instruction on the ground of the absence of any evidence of self-defense, and it argued further that Belinkie's testimony was not proffered as substantive evidence, but was admitted solely as a prior inconsistent statement of Valentino. The state further argued that Lyman Anderson testified that he was taking his young relative to the basement and was hiding behind a wall when the shooting occurred and, therefore, there was no evidence as to what Lyman Anderson specifically observed, outside of his brother raising a firearm. The trial court then reviewed Lyman Anderson's trial testimony. After doing so, the trial court stated: "So, I've reviewed the testimony of Lyman Anderson, and my review does not indicate any testimony he gave which would indicate that the police officers were approaching Lonnie Anderson in a way that would, even under our low standard in Connecticut that would justify a self-defense charge. So—so the defense may have an exception, but the court does not intend to charge the jury on self-defense based [on] the present record." After the trial court delivered its jury instructions, defense counsel took exception to the charge and properly preserved the issue for appeal. See Practice Book § 42-16.

On April 29, 2011, the jury found the defendant guilty of the charges of assault in the first degree and assault of a peace officer, and found the defendant not guilty on the remaining charges. The court sentenced the defendant to a total effective sentence of eleven years of incarceration followed by five years of special parole.[4]

The defendant claims on appeal that the trial court improperly declined to provide a self-defense instruction to the jury.[5] The defendant argues that Lyman Anderson's testimony about a marshal stepping into the threshold of the residence and attempting to grab the defendant was sufficient to warrant a self-defense instruction, when considered in the context of the evi-

dence at trial. The defendant argues further that there was substantial evidence from which the jury could have concluded that the marshals were not readily identifiable, had entered the residence without permission, and were armed. The defendant argues that the jury reasonably could have concluded that the evidence supported the defendant's belief that deadly physical force was necessary to protect himself because he was confronted by two armed individuals in his home. The defendant also argues that the jury reasonably could have concluded from the evidence that the marshal, who was reaching in to grab him, was about to use deadly physical force because the marshals were armed with a variety of weapons, including handcuffs, batons, and Mace, and at least one of the marshals was armed with a firearm.

The state argues, in response, that the evidence did not warrant an instruction on self-defense because the evidence at trial could not have supported a finding that the defendant did not know that Valentino and Quinn were state marshals, none of the witnesses testified that either marshal brandished a weapon during his interaction with the defendant, and the marshals were fleeing the residence at the time the defendant fired at them. We agree with the state.

The following legal principles are relevant to our analysis of the defendant's claim. "In determining whether the defendant is entitled to an instruction of self-defense . . . we must view the evidence most favorably to giving such an instruction." (Internal quotation marks omitted.) *State* v. *Terwilliger*, 294 Conn. 399, 408–409, 984 A.2d 721 (2009). "[T]he fair opportunity to establish a defense is a fundamental element of due process of law . . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . Thus, [i]f the defendant asserts [self-defense] and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to [an] . . . instruction [on self-defense]. . . . Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. . . . To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . . This burden is slight, however, and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Best*, 168 Conn. App. 675, 686, 146 A.3d 1020 (2016), cert. denied, 325 Conn. 908, 158 A.3d 319 (2017). "However low the evidentiary standard may

be, it is nonetheless a threshold the defendant must cross. The defendant may not ask the court to boost him over the sill upon speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 750, 894 A.2d 928 (2006).

To raise a claim of self-defense sufficiently to warrant an instruction, "a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be imminent or immediate. . . . Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that his attacker is using or about to use deadly force against him and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . . Moreover, the evidence must be such that the jury must not have to resort to speculation in order to find that the defendant acted in justifiable self-defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 811, 717 A.2d 1140 (1998).[6]

The following additional facts are relevant to our analysis. At the defendant's trial, Quinn provided the following testimony. Quinn, Valentino, Butler, and Krueger arrived at 434 Indian Avenue in Bridgeport to serve a capias warrant and drove to the residence in two state vehicles. Quinn and Valentino were unarmed and wore their state marshal uniforms with identifiable markers on the sleeves and back of their shirts. Quinn and Valentino went to the front door of the residence, while Butler and Krueger went to the rear of the residence. After knocking on the door, a young child answered the door. The marshals asked for an adult and told the child that they were seeking the defendant. Lyman Anderson arrived at the door and the marshals informed him that he did not match the picture attached to the warrant paperwork that they were carrying. Shortly thereafter, the defendant arrived at the front door and provided a false name to the marshals after he was informed that they had a warrant for his arrest. After providing a false name, the defendant took a step back and pulled out a firearm. Valentino yelled "[g]un" and both marshals immediately retreated down the stairs and ran for cover in opposite directions. Quinn testified that neither he nor Valentino attempted to grab the defendant or take him into custody because the young child was back at the door. As Quinn was running for cover, he heard multiple gunshots and felt a bullet hit his left foot. As Quinn sought cover, he realized that he was also shot in his right forearm.

Valentino provided the following testimony. Valen-

tino arrived at the 434 Indian Avenue residence to serve a capias warrant along with Quinn, Butler, and Krueger. Valentino and Quinn wore their state marshal uniforms with identifiable markers and were unarmed. In particular, Valentino wore a hat that identified him as a marshal. Valentino also wore a utility belt with handcuffs, Mace, gloves, and a baton. After knocking on the front door of the residence, a young child answered the door. The marshals informed the child that they were seeking the defendant, and the young child returned with Lyman Anderson. Valentino, who had the capias warrant and a photograph of the defendant, told Lyman Anderson that he was seeking the defendant. Valentino testified that the young child remained at the door during the entire encounter. Valentino stated that Lyman Anderson and the defendant arrived at the front door. Valentino informed the defendant that he was looking for Lonnie Anderson and the defendant provided a false name in response. Valentino testified that he informed the defendant that he identified him as the subject of the capias warrant, informed him that he missed a court date, and stated that the marshals intended to take him into custody. Valentino testified that the defendant denied that he was Lonnie Anderson, Valentino showed him the photograph, and then the defendant reached back and pulled out a firearm. Upon observing the defendant pull out a weapon, Valentino yelled "[g]un" and slammed the door as he retreated away from the stairs. Valentino and Quinn ran in opposite directions away from the door. As Valentino was running away from the door, he heard gunshots in his direction. While running away from the defendant's residence, Valentino's marshal's hat blew off. Valentino sought cover behind a van and observed the defendant shooting at Quinn. On cross-examination, defense counsel asked Valentino whether he had told the Bridgeport police that "everything kind of hit the fan when . . . Quinn went to grab [the defendant]." Valentino denied that he provided that statement. Defense counsel showed Valentino a document, which was marked for identification purposes only, to refresh Valentino's recollection about the statement that he provided to the Bridgeport police. Valentino responded that he could not recall providing the statement.

Jones, who arrived on the scene after the shooting and assisted in apprehending the defendant, testified on direct examination that he drove to the scene after receiving a report on his radio of an officer being shot. Upon arriving at the scene, he saw an injured male dressed as a civilian standing near a tree. He testified that he did not recall what clothes the male was wearing. He noticed that the male was bleeding. He did not spend any time with the injured man. Jones further testified: "Everything right now seems—seems a blur as to the particulars. . . . Because I was focused on possibly another threat coming from inside that location." On

cross-examination, Jones testified that the injured male was not a uniformed officer. On redirect examination, Jones testified that at no point while on the scene of the shooting did he see any state marshals.

After viewing the facts in the light most favorable to the defendant, we conclude that the trial court properly declined to instruct the jury on self-defense. The evidence presented at trial was undisputed that, *at the time of the shooting*, the marshals were readily identifiable to the defendant and that the marshals were in flight at the time the defendant fired his gun.

As to the defendant identifying Quinn and Valentino as marshals, Lyman Anderson testified that he identified the individuals at the door as marshals, one of the marshals was carrying papers, and, at one point, he spoke to the marshals alone because he believed that the marshals were there for him due to his recent release from incarceration. Furthermore, he testified that the defendant told him, after the defendant fired his gun, that he did not want to step outside because he was concerned that *the marshals* would fire back at him. Moreover, Quinn and Valentino both testified that they wore their state marshal uniforms with identifiable markers on the sleeves and back of their shirts, and Valentino wore a utility belt with handcuffs, Mace, gloves, and a baton as the marshals went to the front of the residence and knocked on the door. Valentino also testified that he was wearing a marshal's hat and Lyman Anderson testified that at least one marshal was wearing such a hat. Quinn and Valentino both testified that the defendant arrived at the front door and provided a false name to the marshals after he was informed that they had a warrant for his arrest. Valentino testified that the defendant denied that he was Lonnie Anderson, Valentino presented the photograph of the defendant, and then the defendant reached back and pulled out a firearm.

In response, the defendant relies on Jones' testimony that the injured man he saw was in civilian clothes and that he never saw state marshals at the scene. There are several problems with the defendant's reliance on Jones' testimony. First, Jones did not arrive on the scene until after the shooting occurred. Thus, he could not testify as to what Quinn and Valentino were wearing when they confronted the defendant before the defendant started shooting. For example, Valentino testified that the marshal's hat he was wearing while standing at the defendant's apartment door blew off when he fled after the defendant pulled his gun. Second, Jones testified that he was responding to a report of an officer shooting, that the injured male was not a uniformed officer, and that he did not pay attention to what the male was wearing. Third, the defendant, at trial, did not rely on Jones' testimony as a basis for his self-defense instruction.

As to whether the defendant was in imminent danger when he fired his gun, Quinn and Valentino both testified that when the defendant pulled out the firearm, they immediately retreated away from the defendant, ran down the stairs, and fled in opposite directions. Quinn and Valentino both testified that they heard multiple gunshots as they ran for cover. Additionally, Valentino testified that, as he sought cover behind a van, he observed the defendant shooting at Quinn. The defendant failed to present any evidence to the contrary.

Thus, the evidence adduced at trial indicates that the marshals immediately retreated from the defendant and away from the front door of the residence when the defendant pulled out his firearm and also indicates that the marshals were in flight, away from the defendant, at the time the defendant fired his gun. The fact that Valentino and Quinn were identifiable to the defendant as state marshals and, more importantly, indisputably were in flight away from the defendant when he fired the shots that were the basis for his conviction distinguishes this case from the following cases on which the defendant relies.

In *State* v. *Deptula*, 31 Conn. App. 140, 142, 623 A.2d 525 (1993), appeal dismissed, 228 Conn. 852, 635 A.2d 812 (1994), this court addressed the issue of whether the trial court improperly failed to instruct the jury on self-defense. At the defendant's trial, the state had relied on the defendant's statement to the police in which the defendant stated that his wife had struck him before he physically attacked his wife. Id., 148. Neither the defendant nor the victim testified at the criminal proceeding. Id. Therefore, we concluded that the trial court improperly refused to instruct the jury on the issue of self-defense because the evidence suggested that the victim was the initial aggressor and there was no duty for the defendant to retreat because he and his wife were in their apartment. Id.

Similarly, in *State* v. *Darrow*, 107 Conn. App. 144, 145, 944 A.2d 984 (2008), this court addressed the defendant's claim that the trial court improperly declined to instruct the jury on self-defense. The evidence adduced at the defendant's trial included two written confessions and one oral confession from the defendant. Id., 148. In the oral confession, the defendant stated that he caught the victim stealing items from his house and, in the process of catching the victim in the act, the victim was killed in the basement as the victim and the defendant engaged in a physical altercation. Id., 150. The state's chief medical examiner testified that it might have been possible that the victim sustained his mortal injury when his head struck a hard piece of wood on the basement's cement floor. Id. On appeal, this court concluded that the evidence that the defendant killed the victim in his house during the altercation was sufficient to entitle the defendant to a self-defense instruc-

tion as a matter of law. Id., 151.

In *State* v. *Best*, supra, 168 Conn. App. 677–79, the underlying criminal proceeding arose out of the defendant's shooting of a mother, her daughter and her daughter's acquaintance. On appeal, the defendant claimed that the trial court improperly failed to provide the jury an instruction on self-defense with regard to certain charges. Id., 676–77. This court concluded that the defendant was entitled to an instruction on self-defense as to the shooting of the daughter and her acquaintance because they did not have permission to enter the defendant's apartment, pounded on the defendant's door with an object, threatened to harm the defendant, and warned the defendant that they " 'had backup.' " Id., 686–87. This court noted that the defendant was faced with an unknown number of intruders who were pounding on his door and leveling threats. Id. This court also concluded that the defendant was not entitled to a jury instruction on self-defense for his conduct toward the mother because, although there was no dispute that the defendant and the mother were arguing during the events leading up to the shooting, none of the evidence adduced at trial indicated that she posed a threat to the defendant. Id., 688.

In each of the cases relied on by the defendant, sufficient evidence was presented that could have raised a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. In contrast, the evidence presented at trial, in the present case, was that the marshals, who were in the process of trying to take the defendant into lawful custody, immediately retreated from the defendant when he pulled out his firearm and were in flight at the time the defendant fired his gun at them. There simply was no basis for the court to give a self-defense charge when the only evidence presented to the jury was that the marshals were fleeing from the defendant when the defendant fired his firearm. See, e.g., *State* v. *Erickson*, 297 Conn. 164, 197, 997 A.2d 480 (2010); *State* v. *Lewis*, 220 Conn. 602, 619–20, 600 A.2d 1330 (1991); *Commonwealth* v. *Miranda*, 484 Mass. 799, 811–13, 146 N.E.3d 435 (2020); *State* v. *Gonzalez*, 143 N.M. 25, 30, 172 P.3d 162 (2007); *State* v. *Niewiadowski*, 120 N.M. 361, 366, 901 P.2d 779 (App.), cert. denied, 120 N.M. 184, 899 P.2d 1138 (1995). Put another way, in light of the undisputed evidence that Valentino and Quinn were fleeing when the defendant shot at them, there was insufficient evidence "to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense." (Internal quotation marks omitted.) *State* v. *Best*, supra, 168 Conn. App. 686. On the basis of the evidence presented at trial, the jury reasonably could not have found, that at the time the defendant fired the gun at the marshals, it was objectively reasonable for the defendant to have believed both that the marshals were about to use deadly physical force or inflict great bodily harm

and that it was necessary for him to shoot at the marshals to prevent such conduct. The court, therefore, did not err in refusing to give the defendant's proposed self-defense instruction.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53a-59 (a) (5) provides that "[a] person is guilty of assault in the first degree when . . . with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes § 53a-167c (a) (1) provides in relevant part that "[a] person is guilty of assault of public safety, emergency medical, public transit or health care personnel when, with intent to prevent a reasonably identifiable peace officer . . .from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties . . . such person causes physical injury to such peace officer . . . ."

[3] "[Section] 53-202k is a sentence enhancement provision and not a separate crime. . . . [Our Supreme Court] [has] interpreted § 53-202k to require that the jury, rather than the court, determine whether a firearm was used in the commission of the underlying felony." (Citation omitted.) *State* v. *Nash*, 316 Conn. 651, 656 n.6, 114 A.3d 128 (2015). General Statutes § 53-202k provides that "[a]ny person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined insection 53a-3, except an assault weapon, as defined insection 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[4] On September 30, 2011, the defendant first appealed from the judgment of conviction. On July 26, 2012, the defendant withdrew that appeal. On March 10, 2015, the defendant filed a pro se petition for a writ of habeas corpus and, on August 31, 2018, the defendant filed an amended petition for a writ of habeas corpus arising out of his judgment of conviction. In the amended petition, the defendant asserted the following claims: (1) his constitutional right to the effective assistance of trial counsel was violated and (2) his constitutional right to the effective assistance of appellate counsel was violated.

On November 8, 2018, the habeas court denied in part and dismissed in part the amended petition with regard to the defendant's claim that the defendant's constitutional right to the effective assistance of trial counsel had been violated. The habeas court granted, in part, the amended petition with regard to the defendant's claim that his constitutional right to the effective assistance of appellate counsel had been violated. The habeas court granted relief in the form of the reinstatement of the direct appeal of the underlying conviction. See *Kaddah* v. *Commissioner of Correction*, 299 Conn. 129, 133 n.7, 7 A.3d 911 (2010). The defendant then filed the present appeal.

[5] We note that the defendant stated in his appellate brief that "it is worth noting that the trial court's decision not to instruct the jury was premised on its belief that Lyman Anderson had not testified that an armed marshal had reached into the home to grab the defendant during the altercation." Our review of the record reveals that the trial court did not premise its ruling on the belief that Lyman Anderson had not testified about an armed marshal reaching into the residence to grab the defendant. During the charge conference, defense counsel stated that he believed that Lyman Anderson testified that "they somehow went to get [the defendant] . . . ." In response, the trial court provided the following statement: "Well, that's important. If Lyman Anderson had testified that there was a—one of the marshals had advanced for his brother *prior to the shots going off*?" (Emphasis added.) The trial court then replayed Lyman Anderson's testimony and ruled that its review of his testimony did not indicate any testimony that would suggest that the marshals were approaching the defendant in a manner that would justify a self-defense charge. Thus, the court considered the entirety of Lyman Anderson's testimony, in particular the timing of the marshals' interactions with the defendant and the shots being fired, and not simply whether,

at some point, the marshals attempted to apprehend the defendant.

[6] In Connecticut, self-defense is codified in § 53a-19. General Statutes § 53a-19 (a) provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

—————————————————————